LENORA JOHNSON          *        CIVIL ACTION NO. 08-cv-0444
O/B/O T. GUILBEAU

VERSUS                 *        JUDGE MELANÇON

MICHAEL J. ASTRUE,       *        MAGISTRATE JUDGE HILL
COMMISSIONER OF
SOCIAL SECURITY

### REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, it is

recommended that the Commissioner's decision be **REVERSED**.

### Background

Born on June 3, 1998, T. Guilbeau (hereinafter "TG") is 11 years old. As of the date of

filing of his current application on December 14, 2005, he was seven years old. Claimant alleges

disability due to Attention Deficit Hyperactivity Disorder (hereinafter "ADHD") and

Oppositional Defiant Disorder (hereinafter "ODD").

On January 13, 2005, and again on December 8, 2005, claimant's mother filed

applications for Supplemental Security Income benefits on his behalf, both of which were denied.

(Tr. 37-43). No appeal was filed after claimant's first application for benefits was denied in

March of 2005.

However, claimant's mother did appeal the denial of claimant's second application. An

administrative hearing was held before the Administrative Law Judge (hereinafter "ALJ") on

May 22, 2007. (Tr. 297-309). Claimant and his mother were unrepresented at that hearing, which

lasted eleven (11) minutes; the ALJ issued on unfavorable decision. (Tr.14-28). Subsequently, claimant's mother retained counsel, and his Request for Review was denied by the Appeals Council on January 16, 2008. (Tr. 4-6). This suit was then timely filed.

### *Standard of Review*

The court's review is restricted under 42 U.S.C. § 405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. *Carey v. Apfel,* 230 F.3d 131, 136 (5th Cir. 2000); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Carey*, 230 F.3d at 136; *Anthony*, 954 F.2d at 292; *Carrier v. Sullivan*, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. *Carey*, 230 F.3d at 136; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. *Johnson*, 864 F.2d at 343.

### *Procedure for Analysis of Impairments - Childhood Disability Benefits*

An individual under age 18 may be found disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §1382c(a)(3)(C)(I).

The regulations provide a three-step sequential evaluation process for determining whether a child's impairments result in "marked and severe limitations." First, if the child is engaging in "substantial gainful activity," the child will be found not disabled regardless of medical condition or age, education, or work experience. 20 C.F.R. §416.924(b). Second, the child must have a severe impairment or impairments. If the child suffers from a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations, the child will be considered to have no severe impairment, and therefore to be not disabled. Title 20 C.F.R. § 416.924(c). Third, the child will be considered disabled if his or her impairment(s) meet, medically equal, or functionally equal in severity a listed impairment in Appendix 1 of Subpart P of Part 404 of the chapter. If a child's impairments do not meet or medically equal a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are disabling. 20 C.F.R. § 416.926a (functional equivalence for children). *See Luckerson v. Apfel*, 2000 WL 1222125 (N.D. Ill. Aug. 22, 2000).

The Social Security Administration (hereinafter "SSA") evaluates a child's impairment by considering broad areas of functioning referred to as "domains." *See* 20 C.F.R. § 416.926a(a). In order to establish functional equivalence, a child must have a medically determinable impairment or combination of impairments which result in marked limitations in two domains or an extreme limitation in one domain. *See Id.* There are six domains that SSA considers in determining functional equivalence in a child's disability case:

(I)      acquiring and using information;
(ii)     attending and completing tasks;
(iii)    interacting and relating with others;
(iv)    moving about and manipulating;

(v)      caring for yourself; and

(vi)     health and physical well-being.

Title 20 C.F.R. § 416.926a(b)(1)(I-vi).

A "marked" limitation in a domain means an impairment "interferes seriously with [the] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §416.926a(e)(2)(I).[1] A "marked" limitation is "more than moderate" but "less than extreme."  *Id.*  An "extreme" limitation will be found when an impairment "interferes very seriously with [the] ability to independently initiate, sustain, or complete activities" within a domain.  20 C.F.R. §416.926a(e)(3).[2]  An extreme limitation is "more than marked," but "does not necessarily mean a total lack or loss of ability to function."  *Id.*  Day-to-day functioning is considered to be seriously limited regardless of whether the impairment limits only one activity within a domain, or several.

---

[1] Title 20 C.F.R. §416.926(e)(2)(i) states as follows:

**(2) Marked limitation.**

(i) We will find that you have a "marked" limitation in a domain when your impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

[2] Title 20 C.F.R. §416.926(e)(3)(i) states as follows:

**(3) Extreme limitation.**

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

### *ALJ's Decision*

The ALJ found that TG has the following severe impairments: ADHD and ODD. The ALJ concluded, however, that TG does not have an impairment or a combination of impairments that meet or medically equal the criteria of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*See* 20 C.F.R. §§ 416.924, 416.925 and 416.926) (Tr. 20). The ALJ found that "the claimant does not have a marked limitation in two areas of functioning or a severe limitation in one area of functioning." The ALJ further found that "the claimant does not have an impairment or combination of impairments that functionally equals the listings." (*See* 20 C.F.R. 416.924(d) and 416.926(a)). While the ALJ found that TG's medically determinable impairments could reasonably be expected to produce the alleged symptoms, "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible." (Tr. 21).[3]

### *Assignment of Errors*

Claimant alleges the following errors:[4]

I.     The ALJ erred in failing to find TG's impairments functionally equaled to a listed impairment;

II.     The waiver of representation by claimant's mother is invalid; and

III.     Claimant's prior application of January 13, 2005, should have been reopened.

---

[3] In his opinion, the ALJ does not identify what statements of which declarant he finds to be "not entirely credible," nor does he say why he makes this finding.

[4] *See* Plaintiff's brief, p. 2 (rec. doc. 12).

*Administrative Record*

## I. Medical and School Records

**A.  Dr. Richard F. Howes, pediatrician**: On February 21, 2005, Dr. Howes' letter to the Office of Disability Determinations summarized his treatment of TG.  (Tr. 136).  Dr. Howes began evaluation and treatment of TG for ADHD and ODD on December 31, 2003.  In addition to ADHD and ODD, TG also exhibited signs of Conduct Disorder in that he often bullied and threatened others, initiated physical fights, deliberately engaged in fire-setting, and lied to obtain favors or avoid obligations.  Despite what Dr. Howes termed TG's "severe behavior problems," TG was passed from Kindergarten to the first grade.  Several medication strategies were tried over a year's time.  His then-current medication regimen was Ritalin LA 30 mg once in the morning, Risperdal 0.5 mg twice daily, and Depakote 250 mg twice daily.  TG's mother noted at the last visit that TG's behavior was improving but was still erratic at times.  Dr. Howes noted that TG had no difficulty with communication and seemed quite capable of learning.  (Tr. 137).  Finally, Dr. Howes stated that TG's "principle difficulties lie in his social interactions."

**A. SSA Childhood Disability Form**:  On March 16, 2005, TG was evaluated by Karen Speier, Ph.D. and Julie Nelson, Ph.D., in conjunction with claimant's first application for benefits filed on January 13, 2005.  (Tr. 138).  On the Childhood Disability Evaluation Form, TG was found to have severe impairments of ADHD and ODD, but these impairments were not found to "meet, medically equal, or functionally equal the listings."  As for the domain evaluations, the examiners noted the following:

(I)      acquiring and using information - no limitation;

(ii)     attending and completing tasks - less than marked limitation;

*(TG is sometimes attentive and sometimes not. He has difficulty working without becoming distracted at times. Possible results include failure to complete assignments and difficulty in understanding directions).*

(iii)  interacting and relating with others - marked limitation;
*(TG often bullies others, initiates physical fights, lies and steals, deliberately sets fires, and destroys property of others.)*

(iv)  moving about and manipulating - no limitation;

(v)  caring for yourself - less than marked limitation;
*(TG has difficulty using good judgment about his safety and dangerous circumstances. He doesn't effectively assert himself and does not always know how to cope with the demands of the school environment. He does not know how to ask for help and can become unnecessarily frustrated.)*

and

(vi)  health and physical well-being - no limitation.  (Tr. 140-41).

It was noted that TG had been moved to special behavior management classes, and he was also receiving some counseling at school. His mother noted that his behavior had improved but that "he was still having erratic behavior at times."

**B. Bryan G. Sibley, M.D.**: On December 27, 2005, Dr. Sibley stated in his letter to the Federal Disability Determination Services that TG had ADHD. (Tr. 144) Dr. Sibley found TG had no limitations in learning, motor functioning, performing self-care activities, communication, socializing, or completing tasks.

**C. Tyler Mental Health Care Center ("Tyler")**: On June 23, 2004, when he was six years old, TG was referred to Tyler by his school (he was a rising first grader at S.J. Montgomery Elementary) for aggressive behavior. (Tr. 159) Social worker Denise Cousins noted that TG was reluctant to talk in session but did enjoy playing with toys. TG had previously attended J.W. Faulk Elementary for kindergarten where he was suspended eleven times. TG's mother felt that

the school was unsupportive and blamed her for everything. (Tr. 160). TG fought with his siblings and "anybody and everybody at school" for no reason. TG made friends easily but lost them quickly because he gets aggressive when he does not get his way. (Tr. 159). TG's medicine regimen continued with Ritalin and Risperdal.

On June 29, 2004, Dr. Gerald Halphen at Tyler noted that TG's reported behavior included aggression, fighting, and oppositionality which allegedly had begun at age two or three years. (Tr. 161). On July 23, 2004, Dr. Halphen diagnosed TG with ADD and ODD. (Tr. 158). No psychosocial or environmental problems were found. TG's Global Assessment of Functioning Scale ("GAF score") was 60.

On December 23, 2004, TG's "Treatment Plan" worksheet listed the following problems: being very active, fighting, defiance/oppositional, non-compliance, short attention span, irritability, social/interpersonal problems, temper tantrums, poor academic performance, and school suspension. (Tr. 156). It is further noted that TG's mother tried using the loss of privileges and reprimands with TG, but those consequences worked inconsistently. (Tr. 157).

On March 18, 2005, Dr . Halphen's notes indicated that TG was stable at school with passing grades but was having trouble with reading. (Tr. 154). On April 15, 2005, TG presented to Ms. Cousins as calm and well-behaved during the session. TG reported that he had been listening to his teacher and behaving at school, and his mother confirmed this as true.

On May 10, 2005, Dr. Halphen's notes indicated that TG "sleeps all day and sleeps well at night." Depakote and Ritalin were continued. On May 20, 2005, TG and his mother reported to Ms. Cousins that he continued to do very well at school. (Tr. 155). He had progressed academically and behaviorally, and TG said he had been good and did not want to "do bad"

anymore.  His manners were very good.  Dr. Halphen prescribed Ritalin LA (30 mg) and Risperdal (0.5 mg).  (Tr. 164).

Throughout the summer of 2005, TG was seen at Tyler on a monthly basis.  Dr. Halphen continued prescriptions of Ritalin, Risperdal and Depakote.  (Tr. 164).  On June 24, 2005, Dr. Halphen noted that TG had been promoted to second grade and that his behavior had improved.  TG's mother reported to Ms. Cousins that TG was no trouble at home, and she was satisfied with his behavior.  TG's mother stated that the implementation of structure had made a difference, and the home environment was much calmer and manageable. (Tr. 153).  The only concern expressed was that TG had a poor appetite on his medicines and had been losing weight.  On August 2, 2005, Dr. Halphen decreased the amount of Depakote. (Tr. 163).  The progress notes in August indicate that his lab work was good except for high levels of Depakote, and his dosage was decreased again.  (Tr. 152).

On August 22, 2005, Ms. Cousins noted the following problems in TG: being very active, non-compliance, short attention span, and temper tantrums.  (Tr. 146).  It was noted that regarding non-compliance, the frequency of occurrence was 1-3 times per week and the trend was toward "getting better." (Tr. 147).  The management strategies were working well according to TG's mother.  Dr. Halphen continued to prescribe Ritalin and Risperdal but discontinued the Depakote on September 2, 2005. (Tr. 163).

On October 14, 2005, TG was again seen by Dr. Halphen at Tyler.  He reported some behavior problems but was unclear about the details.  (Tr. 149).  Ritalin and Risperdal prescriptions were continued.  (Tr. 163).  On October 17, 2005, TG and his mother presented to Ms. Cousins with more behavior problems at school.  Specifically, TG was having temper

tantrums which included turning over chairs and desks. The school decided to place TG in a self-contained classroom which, it was noted, would be helpful for TG since he did not handle transitions well. Progress notes from that day further state that TG was calm and cooperative at home, although his mother limited his contact with his peers because he tended to get into fights when aggravated. (Tr. 149).

On November 15, 2005, TG's mother reported to Ms. Cousins that he had been well-behaved for the most part but had gotten into trouble recently at school for "acting up" in class. It was noted that "TG continues to improve with meds." (Tr. 150). Dr. Halphen continued to prescribe Ritalin and Risperdal on a monthly basis from October of 2005 through September of 2007. (Tr. 162, 163, 191-94, 294-96).

TG visited Tyler once in February of 2006 and several times in May and June of 2006, and progress notes show that he continued to improve. (Tr. 209-10). TG was having mostly good days with minor behavioral incidents at school on other days

In July, 2006, Ms. Cousins saw TG at Tyler and noted that his behavioral progress was varied. (Tr. 208). In August, 2006, TG presented at Tyler with reports of doing poorly at school and of being oppositional. (Tr. 209). On September 20, 2006, progress notes show TG had been having behavioral problems at school again.

On October 19, 2006, an updated evaluation of TG was done. (Tr. 204-5). TG's mother reported that TG did not listen to authorities and got into fights with others. His outbursts lasted up to two hours. She stated that she was overwhelmed with everything that she had to do with TG. (Tr. 204). TG was already taking Ritalin, and Ritalin LA was added at noon for his ADHD symptoms because he was more hyperactive in the afternoon. A trial of Trileptal was also suggested for his impulsive aggressive behavior.

On December 14, 2006, TG and his mother reported to Ms. Cousins that TG had had a few bad days at school, but overall he was doing okay and was making an effort to stay out of trouble. (Tr. 203). During the spring of 2007, TG's mother told Ms. Cousins that TG was progressing well behaviorally at school and at home. Although he had an outburst at school, he was able to calm himself down after about fifteen minutes. On March 21, 2007, TG's school progress was noted as fair. Although he was sent home from school one day, he was able to keep his composure when another student had a fit and disrupted the class for two hours. (Tr. 201, 291).

On June 25, 2007, TG presented in a bad mood. His mother reported that he had been misbehaving at day care by throwing things and trying to fight with other kids. He was in danger of being kicked out of day care. TG was very uncooperative during the session with Ms. Cousins.

On August 29, 2007, TG's mother reported that he was doing well at home and had just started fourth grade at J.W. Faulk Elementary where he was still in a self-contained classroom most of the day but also attended regular classes. (Tr. 289). TG had not had any recent behavioral challenges in the school setting and was doing academically well. At home, TG completed chores and followed directions as given. TG was still on his medications, and his sleep and appetite were both good. (Tr. 288).

On September 27, 2007, TG reported to Tyler having just been suspended from school for throwing scissors at a peer. He also refused to complete assignments at school and exhibited oppositional behavior. TG also refused to complete chores at home and was having trouble sleeping. Modification of medicines was discussed (Tr 287-88).

**D.  Paul M. Friedberg, Ph.D.**: On April 6, 2006, TG was evaluated by Dr. Friedberg at the request of the Federal Disability Determination Service.  Dr. Friedberg stated that TG presented with an Axis I Diagnosis of ADHD, moderate to severe.  (Tr. 172).  His prognosis was considered "quite guarded."  TG was found to be very active, fidgety and restless during the evaluation, but he was alert and generally cooperative.  He was appropriately dressed with fair hygiene.  His gait and posture were normal.  His speech quantity was within normal limits, although somewhat slurred and immature.  His thought processes were logical and coherent.  His attention and concentration were moderately impaired, and he appeared function intellectually in the borderline range.  His insight and judgment appeared to be poor, as did his ability to delay gratification and tolerate frustration.

**E.  SSA Childhood Disability Form**:  On June 6, 2006, TG was evaluated by Jackie Williams, Ph.D., in conjunction with claimant's second application for benefits filed on December 14, 2005.  (Tr. 173-78).  At the time, TG was an eight year old second grader in a Special Education program at his school.  (Tr. 175).  TG was found to have severe impairments of ADHD and ODD, but these impairments were not found to "meet, medically equal, or functionally equal the listings."[5]  As for the domain evaluations, the examiner noted the following:

> (I)    acquiring and using information - less than marked limitation;
> (*TG's current teacher notes that TG receives unspecified "modifications" every day.  He is functioning at grade level in reading but at first grade level in math and written language and has a serious problem with expressing ideas in written form.  He has an obvious problem with providing organized oral explanations, learning new material, recalling and applying information.  TG's treating doctor indicates diagnosis of ADHD but reports no cognitive or academic difficulties.  TG's mother states that he has no limitations.*)  (Tr. 175)

---

[5] This finding was identical to the finding on the SSA form related to claimant's first application for benefits in January of 2005.

(ii)    attending and completing tasks - less than marked limitation;
*(The pediatrician treating TG for his ADHD notes significant improvements from January to October of 2005. His teacher reports that he usually finishes tasks given to him but if he becomes frustrated, he tears up his paper, books and folder. He has an obvious problem with carrying out multi-step instructions, transitioning and organizing on a daily basis).*

(iii)    interacting and relating with others - marked limitation;
*(TG's teacher reports that when he is frustrated, he will not work or be cooperative with anyone. He becomes very aggressive and destructive. He has a behavior intervention plan in place, and this is important, because TG requires a very structured school day. He responds best when there is no change, and any deviation causes him to become frustrated, which results in problematic behavior. TG has very serious problems expressing anger appropriately and an obvious problem making new friends, following classroom rules, and interpreting facial expressions of others. Most of these problems occur on a daily basis. He creates classroom disturbance when he does not get his way. He does not have friends his own age.)*

(iv)    moving about and manipulating - less than marked limitation;
*(TG's mother reports no limitation, but his teacher states that he tends to be shaky at times, and his pencil pressure when writing is not strong.)*

(v)    caring for yourself - less than marked limitation;
*(TG's mother reports no limitation, but his teacher states that he has serious problems handling frustration appropriately and being patient when necessary on a daily basis. He is unable to cope and calm himself down. He throws things, kicks his desk, the wall, or anything around him. However, his teacher notes that he is doing better.)*

and

(vi)    health and physical well-being - no limitation.  (Tr. 176).

### E.  Individual Evaluation Integrated Report (Lafayette Parish Special Education Dept.) (January 31, 2005): TG was suspended from school multiple times in the fall of 2004 for throwing things, hitting others, and being verbally abusive.  (Tr 127-28).   TG was evaluated and was found to be strong in all academic subjects.  His impairment was described as "manifest long-term patterns of inappropriate behavior to a severe degree, which adversely affects his

academic performance." (Tr. 131)  It was determined that he qualified for services provided to students with an Emotional Disturbance, according to Bulletin 1508.  (Tr. 131).

**E.  Lafayette Parish School Assessment regarding Individualized Education Program ("IEP") (December 7, 2005)**: TG made good grades in the fall of 2005, and his standardized test scores indicated above average functioning in all areas.  (Tr. 114, 116).  However, because his inappropriate behavior interfered with his academic progress, it was determined that he needed to be placed in a self-contained classroom in order to be successful at school.  (Tr. 117, 120).

**F.  Teacher Questionnaires (February, 2005, February, 2006, May, 2006)**:  In February, 2005, TG's first grade teacher noted that he had "obvious problems" with acquiring and using information in the following ways: learning new material, expressing ideas in written form, providing organized oral explanations, and participating in class discussions.  (Tr. 103).  In February, 2006, TG's second grade teacher noted the same problems and also a "serious problem" with expressing ideas in written form.  (Tr. 96).  In May, 2006, TG's special education teacher noted the following "serious problems:" comprehending and doing math problems, learning new material, providing organized oral explanations, and applying problem-solving skills in class discussions.  (Tr. 88)  She also noted that expressing ideas in written form was a "very serious problem."  She stated that TG did not participate in discussions, was uncooperative, and was prone to throw things around him when frustrated.  TG's mother was called frequently to come to school and calm him down.

Regarding attending and completing tasks, TG's first grade teacher noted that he had a "serious problem" changing from one activity to another and a "very serious problem" working without distracting others on a daily basis.  (Tr. 104).  TG's second grade teacher noted the

following as "obvious problems" on a daily basis: carrying out multi-step instructions, changing from one activity to another, and organizing his own materials. (Tr. 97). TG's special education teacher noted all of those problems as "serious" and also the following "serious problems:" paying attention when spoken to directly, refocusing to task, waiting to take turns, working without distracting others, and working at a reasonable pace. (Tr. 89). She noted that TG would often shut down and become very angry.

Regarding interacting and relating with others, TG's first grade teacher noted several "obvious problems" as well as the following "serious problems" on a daily basis: playing cooperatively with others, making and keeping friends, and following rules. (Tr. 105). She also noted the TG had "very serious problems" with both seeking attention and expressing anger appropriately on a daily and hourly basis. TG was on an hourly behavior plan which included a personal assistant part of the day, removal from the classroom, suspension, and counseling. TG's second grade teacher noted several of the same problems listed above, but only as "obvious" and not "serious" problems. She found TG had a "very serious problem" with expressing anger appropriately. (Tr. 98). She and TG's special education teacher noted that behavior modification was an important part of TG's day, which was *monitored every fifteen minutes*. (emphasis added) (Tr. 98, 90). TG's special education teacher noted all of the above-listed problems, including six issues that she rated as "serious" and the following which she rated as "very serious:" seeking attention and expressing anger appropriately on a daily basis. She noted that at times he became so angry that he was a threat to himself and others. (Tr. 90).

In moving about and manipulating objects, TG's first grade teacher found an "obvious problem" moving and manipulating things. (Tr. 106). His second grade teacher an "obvious problem" with planning and executing controlled motor movements. She and his special

education teacher both found that TG appeared shaky at times while running and did not press down hard with his pencil.   (Tr. 99, 91).

Regarding caring for himself, TG's first grade teacher notes the following "serious problems:" using good judgment regarding personal safety and dangerous circumstances, responding appropriately to his mood changes, using appropriate coping skills, and knowing when to ask for help.  She noted the following "very serious problems:"  handling frustration appropriately and identifying and appropriately asserting emotional needs.  (Tr. 107).  TG's second grade and special education teachers noted several "obvious problems" and also the following "serious problems:" handling frustration appropriately and being patient when necessary.  (Tr. 100, 92). His special education teacher also found the following to be "serious problems:" identifying and appropriately asserting emotional needs, responding appropriately to his mood changes, using appropriate coping skills, and knowing when to ask for help. (Tr. 92). She noted that he often screamed and was disrespectful.  It was noted that while TG had been doing fairly well, there were still times that he threw things, kicked his desk, and was unable to calm himself down.  There were times when a parent or grandparent had to be called to come to school to calm him down.

**E.  <u>Lafayette Parish School Assessment regarding IEP, dated May 11, 2006</u>**:  In May of 2006, a group of faculty met to assess TG's progress at school. (Tr. 238-263).  In May of 2007, a group of faculty again met to assess TG's progress at school. (Tr. 179-90).  TG had been referred to the Individualized Education setting in November, 2005, because of his serious inappropriate behaviors that were interfering with his academics.  His progress in the general education setting was impaired by his behavioral outbursts.  Because his behavior met the criteria for having an emotional disturbance, TG was placed in a self-contained setting where all of his

academic and behavioral needs could be met.  (Tr. 179, 238).  He was known to leave assigned areas without permission, kick tables, turn over chairs, and throw any object that he could lift.  He would also spit, scream, and run around the classroom.  As of the 2006 assessment, TG still had problems with following directions and with throwing items.  (Tr. 248).  It was recommended that TG remain in a self-contained classroom.

E.  **Lafayette Parish School Assessment regarding IEP, dated May 9, 2007**:  After being placed in the self-contained setting, TG's behavior was reported to have improved.  (Tr. 185).  The occurrences of inappropriate behavior had gone from several times per day to perhaps once per week, and in some weeks, none at all.  It was noted that TG had a behavior plan on file and that the steps needed to continue to be followed  (Tr. 179).  TG needed the distractions kept to a minimum to get the most benefit from his lessons, and he needed to have assignments broken down into manageable units.  He needed to remain in a self-contained setting.

Testing revealed average to above-average functioning.  He was reading at the fourth grade level at the end of the 2006-2007 school year, and his grades were acceptable in all subjects.  He attended reading class with regular education students.  (Tr. 183).  While TG still got frustrated at math, he was able to "be in control" of himself and complete his assignments most of the time, although at times he needed prompting and encouragement to succeed  (Tr. 184).

II.    **Testimonial Evidence**

The ALJ hearing took place on May 22, 2007, in Lafayette, Louisiana.  TG and his mother testified at the hearing as well as an impartial medical expert, Dr. James Cole, Ph.D., a psychologist ("ME").  The ALJ noted that "[a]lthough informed of the right to representation, the claimant chose to appear and testify without the assistance of an attorney or other representative."

(Tr. 17). Upon being asked about getting a lawyer, TG's mother responded that Legal Aid could not represent her and that she had been playing phone tag with another lawyer, but she was ready to proceed anyway. (Tr. 299). She testified as to her age, current address, and her schooling. (Tr 301). She stated that she lived with her four children and that TG's father lived in Lafayette also.

She stated that she first noticed TG's behavioral problems at age two. (Tr. 302). At age three, TG started preschool and began fighting with other kids and exhibiting aggressive behavior. At that point, Dr. Howes tested TG and determined that he was ADHD just like his oldest brother. Then TG underwent further testing and treatment. TG was prescribed Ritalin, Trileptal and Clonidine seven days a week.

TG's mother reported that TG attended J.W. Faulk school and that TG was doing "OK" working in a self-contained classroom with Ms. Henry for the entire school day except during reading, when he was with a different teacher. (Tr. 303). She testified that TG had good days and bad days. On good days, he went to class and did his work. She stated that as long as TG was in the self-contained classroom and was having a good day, then he was okay. On bad days, he stayed with Ms. Henry and stayed the corner and wouldn't move for the day.

She indicated that he has improved with the structured school setting and also with his medications. She further stated that TG's fighting at school had slowed down a bit and that they had been teaching TG to control his own behavior a bit more. (Tr. 305).

TG's mother stated that her older son received SSI benefits and was treated by the same physician. Both boys visited the mental health clinic monthly. (Tr. 304). The ME indicated that the records he reviewed showed that November of 2005 was the last time TG had been to the clinic, but TG's mother stated that they were still going to the clinic on a monthly basis.

TG testified that he is eight years old and likes to play his X-Box 360 video game when he is not in school. (Tr. 306). He also testified that he plays with friends in his neighborhood.

The ME's opinion was that TG did not meet the listing for ADHD, which would require that he have marked hyperactivity, marked inattention and marked impulsiveness. (Tr. 308). The ME testified that the last records he had from Tyler were dated November, 2005. The ALJ stated that he would request those later records from Tyler and would wait to make his decision until after he received the updated records. The hearing lasted eleven minutes. (Tr. 309).

*Analysis*

**I.      Did ALJ err in failing to find TG's impairments functionally equivalent to a listed impairment?**

 Claimant argues that the ALJ erred in failing to find that TG had at least marked limitations in two domains or one extreme limitation in one domain, which would render him disabled under the Social Security listings.

To "functionally equal" the listings, a child's impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). As discussed previously, these domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Claimant argues that the ALJ erred in finding that TG had a less than marked limitation in the domain of "acquiring and using information," less than a marked limitation as to  "attending and completing tasks," only a marked limitation as to "interacting and relating with others," less than marked limitation as to "moving about and manipulating objects," and less than marked

limitation as to caring for himself. (rec. doc. 12, pp. 2-100). He asserts that the ALJ should have found an extreme limitation as to interacting and relating with others, and at least marked limitations in his ability to acquire and use information, to attend and complete tasks, and in caring for himself.

The records reflect that TG had such severe problems at school with inappropriate behavior that he was moved to a self-contained classroom for every subject except reading. (rec. doc. 14, p. 3). Despite being in a self-contained classroom for seven hours daily from January, 2006 to May, 2006, his special education teacher found that he was still acting out in a variety of ways, including not following directions and with throwing items. While the medical records indicate that TG's behavior improved somewhat on medication, he still exhibited significant problems in dealing with others. TG was on an hourly behavior plan which included a personal assistant part of the day and counseling. When analyzing TG's condition, the undersigned notes that structured settings may reduce symptoms such that a child's ability to function may appear better than it actually is. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).[6]

Regarding interacting and relating with others, TG's special education teacher rated the following as "serious problems" on a daily basis: playing cooperatively with others, making and keeping friends, respecting and obeying adults in authority, introducing and maintaining relevant and appropriate topics of conversation, interpreting meaning of facial expression, hints, and the like, and using adequate vocabulary and grammar to express thoughts. (Tr. 90). She also noted

---

[6] "E. Chronic mental impairments. Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress."

the TG had "very serious problems" with seeking attention appropriately and expressing anger appropriately on a daily basis. She noted that behavior modification was an important part of TG's day which was monitored every fifteen minutes. She noted that, at times, he became so angry that he was a threat to himself and others, and it was necessary to restrain him and call his mother to come to school at least twice per week. (Tr. 90).

The government argues that TG does *not* have an extreme limitation. The government cites testimony of physicians who have only seen TG briefly and who noted that his ADHD responds well to medication, but the government completely ignores most of the school records which evidence the severity of the problems. Further, the government ignores the fact that TG was suspended eleven times in single a year and was finally placed in a self-contained classroom so that he would have no interaction whatsoever with his peers.

In his opinion, the ALJ points to evidence in the record showing that TG's behavior had improved with medication and in the self-contained classroom. (Tr. 25). This evidence is not substantial in light of the evidence showing that TG's behavior problems caused him to be sent to the school office numerous times, resulting in several suspensions. These disruptions have obviously prevented TG from attending school in a regular classroom for several years. The ALJ ignores the provisions of 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E), which are clearly applicable here.

There is no evidence in the record which supports the ALJ's determination that "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not entirely credible." (Tr. 21). On the contrary, the overwhelming and uncontradicted weight of evidence from all of TG's teachers shows a child with extreme limitations in interacting and relating with others. This evidence is consistent over time and overwhelming in

nature. The ALJ may not "pick and choose" only that evidence which supports his decision, but must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong v. Sullivan*, 814 F.Supp. 1364, 1373 (W.D. TX 1993), *citing DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir.1983); *Rivera v. Sullivan*, 771 F.Supp. 1339, 1351, 1354, 1356 (S.D.NY 1991). The ALJ has completely failed to do that here. The ALJ did nothing other than make the conclusory finding that some unspecified statements were not entirely credible. This unsupported statement on credibility is not entitled to deference.

TG's severe impairments of ADHD and ODD cause extreme problems for him in interacting and relating with others. After being suspended eleven times in one year and being disciplined on many other occasions at school, TG was placed in the most structured environment available in the school setting, that is, in a classroom with no other students and a teacher or aide with him almost constantly to monitor his work and behavior.

As discussed above, an impairment functionally equals a listed impairment if it results in marked limitations in two domains or an extreme limitation in one domain. While TG's behavior may have improved somewhat, his ADHD and ODD still "interfered very seriously with his ability to independently initiate, sustain, or complete activities." Therefore, the undersigned finds that the combination of these impairments (ADHD and ODD) meets the required standard under 20 C.F.R. § 416.926(e)(3)(I) for determining functional equivalence to a listed impairment. Accordingly, the undersigned concludes that TG has an extreme impairment in the domain of "interacting and relating with others" under 20 C.F.R. § 416.926a(b)(1)(iii). This is shown by the consistent record of his teachers and is without contradiction or limitation.

Thus, the ALJ erred in finding only a marked limitation in this domain is not supported by substantial evidence.

The record clearly shows that TG has not shown ability to recognize what is acceptable and unacceptable behavior or an ability to control his behavior or avoid behaviors that are bad for him and that could potentially cause harm to himself and others. Accordingly, undersigned also finds that TG has at least a marked limitation in the domain of his ability to care for himself. The ALJ's conclusion to the contrary is not supported by substantial evidence.

**II.** ***Did ALJ err in finding the waiver of representation by claimant's mother was valid?***

Because the undersigned concludes that the record convincingly shows that TG functionally met the listings during the period in question, it is unnecessary to address whether the ALJ failed in finding that the waiver of representation by TG's mother was valid.

**III.** ***Did ALJ err in failing to reopen TG's prior application of January 13, 2005?***

As discussed above, Claimant filed her first application for benefits on January 13, 2005 (Tr. 41-46), and the Commissioner denied the application on March 17, 2005 (Tr. 37-40). Claimant did not appeal the first denial, although she was advised therein that she had sixty (60) days within which to do so. (Tr. 38). Instead, Claimant filed a new application on December 8, 2005. (Tr. 63-65). Claimant alleges that the ALJ erred by not reopening the first application and considering the period beginning January 13, 2005.

Claimant did not expressly request a reopening of her prior application when she filed her second application for benefits, the latter of which is at issue in this case. Nonetheless, claimant alleges that because the ALJ relied on medical evidence obtained in connection with the prior

application, the prior application was implicitly opened (rec. doc. 12, pp. 12-13).[7] However, the ALJ's mere discussion of TG's medical history prior to January 13, 2005, the date of the first application, did not effectively reopen the January application, but was only a detailed consideration of the December, 2005 application. *See Rohrich v. Bowen,* 796 F.2d 1030 (8th Cir. 1986).

Further, claimant asserts that the ALJ should have explicitly reopened claimant's earlier application for benefits under the authority of 20 C.F.R. § 416.1488.[8] (rec. doc. 12, pp.12-13). The regulations provide in pertinent part:

> **§ 416.1488 Conditions for reopening.**
> A determination, revised determination, decision, or revised decision **may be reopened**–
>
> (a) Within 12 months of the date of the notice of the initial determination, for any reason. (emphasis added)

While the regulations provide that a prior application **may** be reviewed, there is no requirement that the ALJ do so.

When a claimant who is disappointed with a decision of the Social Security Administration fails to appeal that decision within the proper amount of time, the decision becomes final, and the claimant will "lose [the] right to further review." *Wilder v. Apfel,* 153 F.3d 799, 804 (7th Cir. 1988).[9] The ALJ's decision not to grant a request for reopening, whether express or implied, is not reviewable by this Court. The Supreme Court has unequivocally interpreted the Social Security Act to preclude judicial review of a decision not to reopen a prior

---

[7] Specifically, claimant refers to correspondence from Dr. Howes dated February 21, 2005 (Tr. 136).

[8] *See also* 20 C.F.R. § 404.988.

[9] *See also* 20 C.F.R. § 404.987(a) and § 416.1487(a).

claim except where denial of the reopening request raises "colorable constitutional issues that are not inextricably intertwined with [the] claim for benefits." *Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980 (1977).[10]

Claimant has not alleged a constitutional violation. Claimant's entire argument is that the ALJ erred in not re-opening the prior application. As set forth above, however, the court lacks subject matter jurisdiction to review a decision by the ALJ not to reopen a case. Thus, the date of the second application is controlling in this case.

### *Conclusion*

For the foregoing reasons, the undersigned concludes that the ALJ's decision is not supported by substantial evidence, and recommends that the Commissioner's decision be **REVERSED**, and that Lenora Johnson be awarded supplemental security income benefits on behalf of her minor son, TG, for the period beginning on December 8, 2005, which is the date on which the second application for benefits was filed

Under the provisions of 28 U.S.C. Section 636(b)(1)(c) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed. R.Civ.P.**

---

[10] *See also Kinash v. Callahan,* 129 F.3d 736 (5th Cir. 1997);*Torres v. Shalala*, 48 F.3d 889, 890 (5th Cir. 1995); *Robertson v. Bowen,* 803 F.2d 808 (5th Cir. 1986) ("federal courts have no subject matter jurisdiction to review a decision by the Secretary not to reopen a case").

**6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** *See* **Douglass v. United Services Automobile Association, 79 F.3d 1415 (5th Cir. 1996).**

Signed at Lafayette, Louisiana, July 24, 2009.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE